STATE EX REL. ALTOP, RESPONDENT, *v.* CITY OF BILL-
INGS ET AL., APPELLANTS.

(No. 6,059.)

(Submitted February 16, 1927. Decided April 6, 1927.)

[255 Pac. 11.]

*Innkeepers — Rooming-houses — Cities and Towns — Power to
License—Appeal and Error—Theory of Case.*

Appeal and Error—Trial—Theory of Case.
    1. Where counsel acquiesces in the submission of a cause to the
district court upon a certain theory, he will not be heard on appeal
to advance a different one.

Cities and Towns—Licenses—Rooming-houses—Power of City to Regulate.
    2. The business of conducting a rooming-house, though a legitimate
one, is so far concerned with the health, morals and welfare of the
public that it is within the police power of a city to regulate it
under the authority conferred by subdivision 1 of section 5039, Re-
vised Codes of 1921, denominated the "general welfare clause."

Same—Regulation of Rooming-houses—Licenses—Ordinances—When not
Invalid as Conferring Arbitrary Power.
    3. A city ordinance which vests in its officials a discretion to grant
or refuse to grant a license to carry on a lawful business, to be
valid, need not, where the ordinance relates to the administration
of a police regulation necessary to protect the general welfare,
morals and safety of the public, prescribe all the conditions upon
which such license shall be granted or refused; the fact that in in-
stances it may be exercised arbitrarily, in the absence of specific
directions, not being an argument against its validity, since in such
a case the person discriminated against may apply to the courts for
relief.

Same—Rooming-houses—Licenses—Ordinance Held not Invalid as Con-
ferring Arbitrary Power on City Council.
    4. Under the above rule (par. 3) *held*, that an ordinance providing
that upon application for a license to conduct a rooming-house, the
city council should refer it to the proper committee and the chief
of police for investigation, they being required to investigate all
the facts stated in the application, as well as the qualifications and
character of the applicant and report back their recommendations,
and that if the council thereupon should determine that the applicant
is not a proper person or that the house might be so operated as
to be a menace to the public health, peace, morals or general wel-

    1.  See 2 R. C. L. 79.
    2.  See 6 R. C. L. 226.

fare of the city, the application should be denied, is not invalid as conferring an arbitrary power to grant or refuse to grant a license for conducting a lawful business.  (MR. JUSTICE GALEN dissenting.)

[1]  Appeal and Error, 4 C. J., sec. 2608, p. 701, n. 49.
[2]  Constitutional Law, 12 C. J., sec. 418, p. 911, n. 45; sec. 439, p. 928, n. 6.  Innkeepers, 32 C. J., sec. 19, p. 538, n. 80, 81; sec. 20, p. 539, n. 86, 88 New; sec. 21, p. 539, n. 2; sec. 22, p. 539, n. 7.
[3, 4]  Innkeepers, 32 C. J., sec. 21, p. 539, n. 3; sec. 22, p. 540, n. 10.

*Appeal from District Court, Yellowstone County, in the Nineteenth Judicial District; W. H. Poorman, a Judge of the First District, presiding.*

PROCEEDING by the State, on the relation of Violet Altop, against the City of Billings and others, for an injunction restraining enforcement of an ordinance and for a writ of mandate to compel defendants to issue a rooming-house license. From a judgment for relatrix, defendants appeal. Reversed and remanded, for further proceedings.

*Mr. M. J. Lamb,* for Appellants, submitted a brief and argued the cause orally.

*Mr. H. C. Crippen* and *Mr. F. G. Huntington,* for Respondent, submitted a brief; *Mr. Crippen* argued the cause orally.

MR. JUSTICE STARK delivered the opinion of the court.

The complaint in this action, after setting out in paragraph 1 existence of the defendant city and that the individual defendants are officers thereof, alleges that the plaintiff is, and for many years last past has been, conducting a rooming-house in the city of Billings called the "Owl Rooming House" under a license issued by the city; that on November 5, 1924, the city council of the city of Billings enacted Ordinance No. 995, which made it unlawful for any person to conduct a hotel or rooming-house in said city without having first obtained a license therefor, on application approved by the city council. Section 2 of this ordinance is as follows:

"Any person, firm, or corporation desiring a license to conduct a rooming-house or hotel shall make application therefor to the city clerk on forms to be provided, which application, if made by a firm or corporation, shall state the name of such firm or corporation, the date of its organization, its address or proposed location, the names and addresses of all persons interested in said firm, the names and addresses of all officers and trustees or directors, the name of the rooming-house or hotel and the number of rooms therein, and such other and further pertinent information as the city council may require. On receipt of such application, the city clerk shall submit the same to the council at its next regular session, and thereupon said application shall be referred by the city council to the license and bond committee of the city council and to the chief of police for investigation. The chief of police and the license and bond committee shall investigate the facts stated in the application, the qualifications and character of the applicant and of the individuals, officers, or trustees of the firm or corporation, and report their recommendations. The city council may demand such other and further investigation that it may deem advisable. If the city council shall determine that the applicant for such license or that the persons interested in the ownership of such rooming-house or hotel are not proper persons or that such rooming-house or hotel may be operated in such manner as to be a menace to the public health, peace, morals, or general welfare of the city, such application shall be denied."

The next paragraph of the complaint is as follows: "That heretofore, to-wit, on or about the 15th day of September, 1925, this relator made due application to the city council of the city of Billings, on a form provided by the city clerk, for a license to conduct the said Owl Rooming House, at No. 16½ North Twenty-Seventh Street, in the said city of Billings, for the year 1925, and at said time offered to pay the amount of the license fee which would be required of her, and also at said time stated that she was willing and able to furnish a good

and sufficient surety bond, in the sum of five hundred dollars ($500), as provided in section 6 of said ordinance, and thereafter her application, so made, was denied and rejected by the city council of the city of Billings, and she was notified to desist from conducting said rooming-house, and further notified and warned that, if she persisted in conducting said rooming-house, she would be arrested, as provided in said ordinance.''

It is then set out that for many years the relator had made a livelihood out of conducting said rooming-house and had invested in the furnishing thereof approximately the sum of $4,000; that she has no other property; that the action of the city council in denying her a license to conduct her rooming-house will, if upheld, subject her to a loss of her property and her means of livelihood; that, by virtue of sections 2485 to 2502, Revised Codes of 1921, providing for the licensing, regulation and inspection of hotels and rooming-houses by the state board of health, cities of the state of Montana are relieved of any duty or responsibility for the inspection and regulation of such places.

The prayer is (1) for an injunction restraining the defendants from enforcing said Ordinance No. 995 as to the relatrix, and from interfering with her in connection with conducting her said rooming-house; (2) that, if said Ordinance No. 995 be upheld as a valid exercise of delegated power to the city council, in so far as its terms enable the city to exact a license fee from persons conducting hotels or rooming-houses in said city, defendants be required by a peremptory writ of mandate to cause to be issued to the relatrix a license to conduct her rooming-house, upon her paying the amount of license fee required thereunder.

As originally filed, this complaint contained numerous allegations to the effect that Ordinance No. 995 was wholly void and invalid, but, on motion of defendants, all such allegations were stricken therefrom.

On filing the complaint, an order was issued, dated October 19, 1925, restraining the defendants from interfering with the relatrix in the conduct of her rooming-house during the pendency of the action. The court also issued an alternative writ of mandate commanding the city, its mayor and city council, to issue to relatrix a license to conduct her rooming-house upon her paying the required fee thereunder and furnishing a bond as prescribed in the ordinance, or that they show cause why they had not done so.

The defendants filed a return to this alternative writ, admitting the allegations of paragraph 1 of the complaint, also the passage of Ordinance No. 995 as alleged, and that relatrix had for a number of years conducted a rooming-house in the city of Billings under a license issued to her; but denied that she had held any such license since January 1, 1924, and alleged that such former license was revoked by action of the city council on or about April 1, 1924, "after notice of charges were made and served, * * * duly notifying her to appear before said council and show cause why her said license theretofore issued should not be revoked," and that relatrix had never been granted a license to operate or conduct a rooming-house in the city of Billings since that date; alleged that on the third day of March, 1925, the relatrix made application to the city council of the city of Billings for a license to conduct her said rooming-house, and that said application was, after inspection and investigation by the said city council and the chief of police, refused by said city council, and that on or about the fifteenth day of September, 1925, the relatrix again made application to the city council for a license to operate her said rooming-house, and that said application was refused by the city council. All of the other allegations of the complaint were denied. For a further defense, the answer set forth numerous matters tending to show that relatrix was not a proper person to operate or conduct a rooming-house in the city of Billings.

To this answer, the relatrix filed a reply, denying each and every allegation thereof "save and except such * * * as admit the allegations of plaintiff's complaint."

The cause finally came on for trial on March 27, 1926, whereupon counsel for the relatrix said to the court: "Under the admissions contained in the return of the defendants that the relatrix made application to the city council of the city of Billings on the third day of March, 1925, for a license to conduct the Owl Rooming House, and that such application was denied, and that a license was refused by the city council, and such return admitting that on the fifteenth day of September, 1925, this relatrix made application to the city council of the city of Billings for a license to operate the same rooming-house, that the application was denied and the license refused, the relatrix will not offer any evidence, and will object to any evidence that may be offered to sustain the affirmative allegations of the separate defense of the defendants, for the reason * * * that a rooming-house is a legitimate and ordinary business, * * * that the relatrix or anybody else has a right to conduct a legitimate business, and that it was not within the power of the city council to deny a license to the relatrix, * * * but, even if they have the power, we maintain it is a power that they cannot exercise arbitrarily; that, even if the statute and the ordinance passed under the statute contain provisions by which they could refuse, then that their act could not be arbitrary. * * * We rest and offer no evidence."

Whereupon counsel for the defendants said: "The defendants move that this action be dismissed, that the court find in favor of the defendants and give judgment in favor of the defendants on the ground that the complaint * * * does not set forth facts sufficient to constitute a cause of action. The complaint is fatally defective, for the reason that it does not set forth any facts showing that the city council acted in abuse of discretion, arbitrarily or capriciously, nor does it allege any such facts by way of conclusion."

After a somewhat extended discussion between the court and counsel concerning the issues presented by the pleadings and the fact statements made by counsel, the court overruled defendants' motion for judgment, and said: "The ruling of the court  *  *  *  is that under the facts admitted in the pleadings and the statement of counsel as to their relative positions, the merits of the controversy may be determined here without evidence submitted at this time, and for that reason the evidence is refused." Counsel for defendants made no objection and took no exception to these rulings, but acquiesced therein, and submitted the matter for final determination upon the theory outlined by the court.

After arguments made and briefs submitted by respective counsel, the court rendered judgment in favor of relatrix, which, after stating that the cause came on for trial on March 27, 1926, recited: "Objection of relatrix to the introduction of evidence was sustained, and the cause was submitted upon propositions of law as to the validity of the Ordinance No. 995, which ordinance was enacted by the city council of the respondent city and approved by the mayor thereof on the 5th day of November, 1924." The court by this judgment held that said ordinance was "wholly void and of no force and effect," and made the temporary injunction issued on October 19, 1925, permanent. From this judgment the defendants have appealed and assign as errors that the court erred in denying defendants' motion for judgment, and also in adjudging Ordinance No. 995 void.

At the outset, counsel for the defendants insists that the validity of Ordinance No. 995 should not be considered by [1] the court, for the reasons (1) that all allegations concerning its invalidity had been stricken from the complaint, and (2) that the relatrix having invoked the aid of the ordinance by seeking to compel the issuance of a license to her under its provisions, was precluded from raising any question as to its validity.

We need not consider the interesting questions raised by this contention, for the reason that, from the foregoing statement of the proceedings had at the trial and the recitals in the judgment, it is apparent that the cause was, with the acquiescence of counsel for defendants, in fact submitted to the court upon the sole question whether the ordinance was valid, and they will not be heard to advance a different theory on appeal.

In *City of Helena* v. *Kent*, 32 Mont. 279, 4 Ann. Cas. 235, 80 Pac. 258, it was held that the sections of the Political Code, [2] corresponding with sections 4955, 4958 and 5039 (1), Revised Codes of 1921, as amended by Chapter 115 of the Laws of 1925, constitute a general grant of power to a city to pass all laws necessary for its government and management which do not contravene constitutional or statutory provisions. "In effect, these provisions state what is usually termed the 'general welfare clause,' and under such a clause it is well established that, in the absence of statutory prohibition, the city, in the exercise of its police power, may 'establish all suitable ordinances for administering the government of the city, the maintenance of peace and order, the preservation of the health of the inhabitants, and the convenient transaction of business within its limits, and for the performance of the general duties required by law of municipal corporations.' "

Subdivisions 3 and 4 of section 5039, supra, provide that the city council shall have the power to license all industries, pursuits, professions and occupations, and to fix the amount, terms and manner of issuing and revoking licenses, and may refuse to issue licenses when it may deem it best for the public interests. While subdivision 16 of section 5039, supra, expressly enumerates certain businesses and occupations (not including hotels and rooming-houses) as the subject of license and regulation, it is clear that it was not intended thereby to exclude the right to license and regulate other lines of business, for subdivision 3, referred to above, grants

power to license all industries, pursuits, professions, and occupations, and the general welfare clause (subdivision 1 of section 5039, supra) gives the city council power "to make and pass all by-laws, ordinances, orders, and resolutions not repugnant to the Constitution of the United States or of the state of Montana, or of the provisions of this title, necessary for the government or management of the affairs of a city or town, for the execution of the powers vested in the body corporate, and for carrying into effect the provisions of this title."

Under the foregoing provisions, the city council has power to enact an ordinance for the licensing and regulation of hotels and rooming-houses. (1 Dillon on Municipal Corporations, 3d ed., 141; *Liberis* v. *Harper*, 89 Fla. 477, 104 South. 853; 12 C. J. 911.)

The business of conducting a rooming-house is a legitimate one, in which all persons similarly situated are lawfully entitled to engage, but it is one which is so far concerned with the health, morals and welfare of the public that it is within the police power of the city to regulate it. (12 C. J. 928, 929.) And this power of regulation has been committed to the city council in cities of this state under the general welfare clause of subdivision 1 of section 5039, supra.

Counsel for the relatrix assails the validity of Ordinance No. 995 on the ground that it reserves to the city council [3, 4] the right to grant or refuse a license to an applicant therefor who desires to engage in the business of conducting a rooming-house, at its pleasure, and does not prescribe any uniform rule or condition which is equally applicable to all persons in like situations, and therefore admits of the opportunity for the exercise of an arbitrary discrimination. Counsel for defendants, on the other hand, assert that the ordinance in question does not confer upon the city council the power arbitrarily to grant or refuse such a license but only imposes a duty upon it to be performed by an impartial exercise of a reasonable discretion.

In support of their contention, counsel for relatrix cite, amongst others, the following cases: *City Council* v. *West,* 149 Ala. 311, 42 South. 1000; *Seattle* v. *Gibson,* 96 Wash. 425, 165 Pac. 109; *State ex rel. Makris* v. *Superior Court,* 113 Wash. 296, 12 A. L. R. 1428, 193 Pac. 845; *Vincent* v. *Seattle,* 115 Wash. 475, 197 Pac. 618; *City of Tulsa* v. *Thomas,* 89 Okl. 188, 214 Pac. 1070; *Samuels* v. *Couzens,* 222 Mich. 604, 193 N. W. 212; *State ex rel. Haddad* v. *City of Charleston,* 92 W. Va. 57, 27 A. L. R. 323, 114 S. E. 378; *Crossman* v. *City of Galveston,* 112 Tex. 303, 26 A. L. R. 1210, 247 S. W. 810; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 30 L. Ed. 220, 6 Sup. Ct. Rep. 1064.

On the other hand, counsel for defendants cite as sustaining his position, *Cutsinger* v. *City of Atlanta,* 142 Ga. 555, Ann. Cas. 1916C, 280, L. R. A. 1915B, 1097, 83 S. E. 263; *Cofman* v. *Ousterhous,* 40 N. D. 390, 18 A. L. R. 219, 168 N. W. 826; *Town of Sumner* v. *Ward,* 126 Wash. 75, 217 Pac. 502; *State ex rel. Lane* v. *Fleming,* 129 Wash. 646, 34 A. L. R. 500, 225 Pac. 647; *State ex rel. Hamrick* v. *Pocohontas Court,* 92 W. Va. 222, 114 S. E. 519; *Plumas* v. *Town of Cosmopolis,* 128 Wash. 697, 223 Pac. 1052; *Gundling* v. *City of Chicago,* 177 U. S. 183, 44 L. Ed. 725, 20 Sup. Ct. Rep. 633; *People* v. *Harley,* 230 Mich. 676, 203 N. W. 531; *Swearingen* v. *Bond,* 96 W. Va. 193, 36 A. L. R. 1500, 122 S. E. 539; *Tighe* v. *Osborne,* 150 Md. 452, 46 A. L. R. 80, 133 Atl. 465; *McIntyre* v. *Murphy,* 177 N. C. 300, 98 S. E. 820; *Ex parte Hitchcock,* 34 Cal. App. 111, 166 Pac. 849; *Riley* v. *Chambers,* 181 Cal. 589, 8 A. L. R. 418, 185 Pac. 855.

To review all of the cases mentioned in the briefs would be a herculean task. To harmonize and reconcile the various holdings would be humanly impossible. We shall not attempt either.

The ordinance in question provides that, when application is made for a license to conduct a rooming-house, the city council shall refer it to the license and bond committee and

the chief of police for investigation, and they are required to investigate all the facts stated in the application, together with the qualifications and character of the applicant, and report their recommendations, and, in addition thereto, the council may demand further investigation. With the facts thus developed, if the council determines that the applicant is not a proper person or that the proposed rooming-house may be so operated as to be a menace to the public health, peace, morals or general welfare of the city, the application shall be denied.

The generally accepted rule that an ordinance which vests in public officials a discretion to grant or refuse to grant a license to carry on an ordinarily lawful business, without reference to all of the classes to which the ordinance is intended to apply, without being guided by specifically enumerated conditions to which all persons similarly situated may knowingly conform, is invalid, is subject to the qualification that where it is impracticable to lay down a definite or all-comprehensive rule, or where the ordinance relates to the administration of a police regulation and is necessary to protect the general welfare, morals and safety of the public, it is not essential to the validity of the ordinance that it prescribe all the conditions upon which such license shall be granted or refused. In order to show how the rule last adverted to has been applied by many courts, we shall refer somewhat at length to the decisions.

In *Cutsinger* v. *Atlanta,* supra, it was held that a statute conferring power in general terms upon local authorities to grant or refuse, in their discretion, licenses to keep hotels and lodging and rooming houses, without prescribing the bounds of such discretion, was not *ipso facto* void as being an effort to confer arbitrary power, but rather was a grant of power to exercise a reasonable discretion in the grant or refusal of such license.

In *State* v. *Cohen,* 73 N. H. 543, 63 Atl. 928, a statute authorizing city officials to license persons "deemed by them

to be suitable" to be junk dealers was held constitutional as against the objection that it granted arbitrary power, on the theory that the junk business endangers the public morals, safety and welfare, and that in such a case the reasonable discretion may be vested in public officials.

In *Engel* v. *O'Malley*, 219 U. S. 128, 55 L. Ed. 128, 31 Sup. Ct. Rep. 190, the supreme court of the United States upheld a statute of the state of New York, which required private bankers to obtain a license from the state comptroller, and provided that the latter approve or disapprove an application in his discretion, although no guides were given in the statute for the exercise of such discretion, upon the theory that such regulation was one for the public safety, enacted by the state in the valid exercise of its police power.

A case frequently referred to in the decisions in *Buffalo* v. *Hill*, 79 App. Div. 402, 79 N. Y. Supp. 449, in which a municipal ordinance was upheld, authorizing certain public officials to issue license for the sale of meats, on the ground that it merely granted a reasonable discretionary power to determine the fitness of the applicant and the suitableness of his place of business, having regard to the general effect on the health, and that the omission from the ordinance of a rule of action did not render it invalid. In the course of the opinion, the court, after reviewing a large number of cases, said: "It will be observed that in some of the cases adverted to the test upon which the discretion of the mayor was to be exercised was defined in the Act or ordinance creating the authority, while in others there was no limitation placed upon it. It does not follow that the omission to prescribe the bounds of authority carries the conclusion that it is vested arbitrarily in the official or body to whom it is committed. The difficulty of defining in a given case what standard shall be applied in the disposition of the petition and the fact that the conservation of the public health is the basis for the existence of the authority, indicate the reason for the absence of the definition; but it is no warrant for the inference that

the power is an arbitrary one, to be exercised in ruthless disregard of the rights of any class or individual. The discretionary authority must rest somewhere, and experience has shown that its lodgment in some body or official of the municipality is more efficacious than to leave it with the legislature, to whom the local situation may be unknown.''

In *Yee Bow* v. *City of Cleveland,* 99 Ohio St. 269, 12 A. L. R. 1424, 124 N. E. 132, the validity of an ordinance for the licensing and regulation of laundries was involved; and it was there held: ''An ordinance imposing on an administrative officer, as a prerequisite to the issuance of a license, the duties of ascertaining whether sanitary and drainage arrangements are sufficient to protect the public health and whether 'adequate ventilation' and 'adequate plumbing and drainage facilities' are provided on the premises, does not confer arbitrary legislative or judicial powers upon such officer in a constitutional sense. If his conduct should prove to be arbitrary or palpably unwarranted, resort may be had to the courts.''

An ordinance of the city of Chicago forbade the sale of cigarettes by any person without a license. It provided, amongst other things: ''Any person * * * desiring a license to sell cigarettes shall make application for that purpose to the commissioner of public health * * * and shall be accompanied by evidence that the applicant * * * is a person of good character and reputation. The commissioner of health shall thereupon submit to the mayor the said application with the evidence aforesaid, * * * and, if the mayor shall be satisfied'' that the applicant is ''of good character and reputation and suitable to be entrusted with the sale of cigarettes, he shall issue a license in accordance with such application.'' The validity of this ordinance was upheld by the supreme court of the United States in the case of *Gundling* v. *City of Chicago,* supra, and in the course of the opinion it was said: ''In the case at bar, the license is to be issued if the mayor is satisfied that the person applying is of good character and

reputation and a suitable person to be entrusted with the sale of cigarettes, provided such applicant will file a bond as stated in the ordinance as a security that he will faithfully observe and obey the laws of the state and the ordinance of the city with reference to cigarettes. The mayor is bound to grant a license to every person fulfilling these conditions, and thus the fact of fitness is submitted to the judgment of the officer, and it calls for the exercise of a discretion of a judicial nature by him. \* \* \* Whether dealing in and selling cigarettes is that kind of business which ought to be licensed is, we think, considering the character of the article to be sold, a question for the state, and through it for the city to determine for itself, and that an ordinance providing reasonable conditions upon the performance of which a license may be granted to sell such article, does not violate any provision of the federal Constitution.''

In the recent case of *People* v. *Harley,* 230 Mich. 676, 203 N. W. 531, the supreme court of that state had under consideration an ordinance of the city of Highland Park relative to the granting of license to conduct public lodging-houses, the material portions of which do not differ in effect from the Billings ordinance now before us. After providing for making application for such license, the Highland Park ordinance provided in section 2: ''Upon receipt of such application, the city council, before acting upon it, may refer the same for investigation to any officer or officers of the city, who shall report to the council within a reasonable time. If upon the receipt of such application, or if referred as above provided upon the receipt of such report, the city council is satisfied that the applicant is a suitable person to carry on such business and that the granting of such license will not be detrimental to the interests of the public, nor in violation of any statute or any ordinance, rule or regulation of the city of Highland Park, it shall grant such license to the applicant, to be issued upon the payment to the city clerk of the fee hereinafter prescribed.''

The same objections were urged against this ordinance as those now urged against the Billings ordinance by counsel for relatrix. After an extended review of the authorities, the court sustained the validity of the ordinance, and said: "This does not contemplate an arbitrary exercise of power according to caprice or whim, but it does contemplate consideration and care. The power to decide who is suitable must be lodged somewhere. Who is better fitted to decide than the local officers who know local conditions? It must be assumed they will act fairly. If they do not, the courts are still open."

The reasoning of the Michigan court in sustaining the validity of the Highland Park ordinance appeals to us as being entirely correct and well supported by the numerous authorities cited to sustain it. It is in harmony with the decision of the supreme court of the United States in *Gundling* v. *City of Chicago,* supra.

When we consider the situation in which cities are placed in an effort to exercise their undoubted right under the police power to license, regulate and control the business of conducting rooming-houses within their limits, we are forced to the conclusion, under the authorities above referred to, that their ordinances enacted in that behalf come within the exception to the general rule which we have above set forth, and that it is not essential to their validity that they shall prescribe in advance all the conditions under which a license to conduct such a business shall be granted or refused. The ordinance under consideration does not contemplate the exercise of an arbitrary power by the city council according to its whim or caprice, but does impose upon it the duty to exercise consideration and care.

There is neither pleading nor proof in this case that the city council of Billings acted arbitrarily in refusing to grant the application of relatrix for a license.

Entertaining the views above expressed, we are of opinion that the court erred in holding Ordinance No. 995 of the city

of Billings invalid. Defendants' motion to dismiss the action should have been sustained.

The judgment is reversed and the cause remanded to the district court, with direction to take further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*

MR. JUSTICE MATTHEWS concurs.

MR. JUSTICE MYERS, being disqualified, did not hear the argument and takes no part in the foregoing decision.

MR. CHIEF JUSTICE CALLAWAY, concurring specially: That in these modern days rooming-houses, which provide such a facile avenue for evil, are not proper subjects of regulation by the police power probably will not be asserted by anyone. The business of keeping a rooming-house is a legitimate one so long as it is conducted in a legitimate way. That it shall be so conducted is of high importance to society, and, when society either cannot or will not protect itself, it becomes contemptible.

The notion that one of known bad morals and bad practices has an inherent right to conduct a rooming-house against the will of the community is false in fact and in law. But some courts, while conceding that regulation may be necessary, apprehensive of the possibility that wrong may follow the exercise of power arbitrarily, practically nullify the effective use of the power. They fear, and what? That someone will be restricted in his liberty—or license—to do what he pleases regardless of the right and welfare of the community in which he lives?

Ordinances designed to protect public morals, health and safety are absolutely essential. The people are not to be restricted in their right of local self-government by specious arguments based upon the possibility that wrongs may result from the exercise of a power which may be arbitrarily as-

serted. That this is so the more recent and better decisions assert. As illustrative, we observe the departure of the supreme court of the United States from the strict doctrine of *Yick Wo* v. *Hopkins,* 118 U. S. 356, 30 L. Ed. 220, 6 Sup. Ct. Rep. 1064, in *Gundling* v. *City of Chicago,* 177 U. S. 183, 44 L. Ed. 725, 20 Sup. Ct. Rep. 633, though no one denies the rectitude of the Yick Wo decision upon the facts.

As is said in the foregoing opinion, if the council does wrong a citizen by the arbitrary exercise of power, the courts are available to right the wrong.

A comparison of the decisions convinces me that the clear weight of authority sustains the opinion of Mr. Justice Stark. Without entering into a further discussion of the various decisions, it is sufficient to suggest that, in comparison with those opposed, the decisions relied upon by Mr. Justice Stark advance the better reasoning, if not the better oratory.

MR. JUSTICE GALEN, dissenting: It is my opinion that the city ordinance in question is unconstitutional and void, because it attempts to vest in the city council unrestrained and arbitrary authority to determine to whom a license shall be issued to conduct a generally recognized lawful business. All that is required to deny an applicant a license is that the city council shall determine that the applicants are (1) *"not proper persons";* or (2) "that such rooming-house or hotel may be operated in such manner as to be a menace to the public health, peace, morals, or general welfare of the city." The first expression is wholly vague and indefinite, suggests no guide, and imposes no restraint. The second phase requires the city council to *speculate* as to what *may* happen, to leave the realm of present fact, and, by assuming to look into the future, make a present finding. It is impossible of execution.

It is manifest from the plain language employed that the intention is to confer power on the city council to deny a license to an applicant *arbitrarily,* no matter what report may

42 State ex rel. Altop *v.* City of Billings et al. [Mar. T. '27

[79 Mont. 25.]

be made on the application by the chief of police or the license and bond committee. Objection may be raised to the person for any reason, be it good or bad, resulting in a denial to him of the privilege of having an equal opportunity with others to make an honest livelihood. Under such authority, discrimination may be made because of nationality, religion, political adherence and the like; and, on mere suspicion or surmise as to the use for which the place *may be operated,*" the council is vested with authority to refuse a license. Such a delegation of unbridled power is contrary to the basic principle upon which American liberties are grounded. The ordinance warrants arbitrary and discriminatory action by the city council, and that alone is sufficient to condemn it. My views appear to be supported by the great weight of authority. (See exhaustive note to the case of *State ex rel. Makris* v. *Superior Court* in 12 A. L. R., pages 1435 to 1455. The same case is reported in 113 Wash. 296, 193 Pac. 845.)

The majority opinion refers to many of the decisions supporting the rule for which I contend, and recognizes its merit, but does not apply it to the facts before us. It is my opinion, in accord with what I consider the weight of authority, and the correct rule applicable, that a city council cannot, by ordinance or otherwise, reserve to itself the power to grant or refuse licenses to conduct a legitimate business, according to whim or caprice or in an arbitrary manner. (*State ex rel. Haddad* v. *City of Charleston,* 92 W. Va. 57, 27 A. L. R. 323, 114 S. W. 378.)

The very essence of American Constitutions is that the material rights of no man shall be subject to the mere will of another. (*City of Tulsa* v. *Thomas,* 89 Okl. 188, 214 Pac. 1070; 17 R. C. L., p. 506; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746, 28 L. Ed. 585, 4 Sup. Ct. Rep. 652; *Crossman* v. *City of Galveston,* 112 Tex. 303, 26 A. L. R. 1210, 247 S. W. 810; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 6 Sup. Ct. Rep. 1064, 30 L. Ed. 220.)

79 Mont.]    State ex rel. Altop *v.* City of Billings et al.    43

[79 Mont. 25.]

The validity of the ordinance is to be determined, not by what has been done under it, but by that which may be done under it by reason of its provisions. (*City of Butte* v. *Police Court of City of Butte,* 65 Mont. 94, 210 Pac. 1059.)

*Yick Wo* v. *Hopkins,* above cited, is a leading case supporting the rule which I contend to be applicable here. In that case two ordinances were involved, wherein it was provided that: "It shall be unlawful, from and after the passage of this order, for any person or persons to establish, maintain, or carry on a laundry within the corporate limits of the city and county of San Francisco without having first obtained the consent of the board of supervisors, except the same be located in a building constructed either of brick or stone." In speaking for the supreme court of the United States respecting the constitutionality of such ordinances, Mr. Justice Matthews said: "They [the ordinances] seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of mandamus, to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility. The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint. * * * When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean

to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power. It is, indeed, quite true, that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.''

In the case of *Butchers' Union Co.* v. *Crescent City Co.*, supra, Mr. Justice Field made pertinent declarations of the rights of our people in language, to which I most heartily subscribe, applicable here to the ordinance under consideration. The learned jurist, in speaking of the language employed in the preamble of the Declaration of Independence, said: ''Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties,

so as to give to them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright. It has been well said that: 'The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property.' "

"Section 1 of the Fourteenth Amendment to the federal Constitution, and sections 3 and 27 of Article III of the Constitution of Montana, imply, if, indeed, they do not express, a prohibition against the power of the Legislature to enact a law whose effect would be the impairment of a vested right." (*Hinds* v. *Wilcox,* 22 Mont. 4, 55 Pac. 355.)

Rehearing denied April 26, 1927.